1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8

| | |
|---|---|
| GREGORY WILLIAMS, | CASE NO.   1:10-cv-01999-MJS |
| Plaintiff, | ORDER ON DEFENDANT JOHN PINNEGAR'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CITY OF MERCED, et al., | (Doc. 26) |
| Defendants. | |
| _____/ | |

## I.   INTRODUCTION AND PROCEDURAL HISTORY

On October 22, 2010, Plaintiff Gregory Williams initiated this action against Defendants the City of Merced and John Pinnegar, an officer of the City of Merced Police Department.  He seeks recovery for unlawful arrest and for injuries sustained when, during the arrest, Plaintiff was forced to the ground and tasered. On February 14, 2011, before any Defendant appeared in the action, Plaintiff filed a First Amended Complaint.

On October 18, 2011, the parties consented to Magistrate Judge jurisdiction, and so the matter was assigned to the undersigned for all purposes on October 20, 2011. (ECF Nos. 16-18.)

-1-

Presently before the Court is Defendant Pinnegar's Motion for Summary Judgment ("Motion"). Defendant Pinnegar seeks summary judgment on claims one, three, four and five of the complaint for unlawful arrest, excessive force, interference with the enjoyment of Plaintiff's state constitutional rights, intentional infliction of emotional distress, and assault and battery, respectiovely. Defendant also seeks summary adjudication of Plaintiff's claim of punitive damages under state law.

During the meet and confer process, Plaintiff agreed to dismiss his second, sixth and portions of his first cause of action. Accordingly, the instant motion addresses the remaining claims of the first amended complaint. The motion was argued before the undersigned on January 18, 2013.  Plaintiff's counsel, Adante D. Pointer, and Defendant's counsel, Kevin P. Allen, both appeared in person. The matter stands ready for adjudication.

## II.    PLAINTIFFS MOTION FOR SUMMARY JUDGMENT

With dismissal of the second and sixth causes of action and his due process and pre-conviction punishment claims, Plaintiff's remaining causes of action are as follows:

a.)    Plaintiff's first cause of action alleges violation of the Fourth Amendment  by virtue of Defendant Pinnegar's unreasonable seizure of Plaintiff and use of excessive force in the process thereof;

b.)    The third cause of action claims the wrongful actions of Defendant Pinnegar denied Plaintiff rights provided him under the California Constitution;

c.)    The fourth cause of action is for intentional infliction of emotional distress; and,

d.)    The fifth cause of action is for assault and battery.

-2-

Defendant Pinnegar asserts that there is no genuine dispute as to any fact material to these causes of action or as to Plaintiff's prayer for punitive damages.  Further, he argues that he is entitled to judgment as a matter of law on each cause of action and on the punitive damage claim because under the undisputed material facts: he had probable cause to arrest Plaintiff; exigent circumstances justified arresting Plaintiff in his home without a warrant; he used reasonable force, and made no threats, in his dealings with Plaintiff; he has immunity from Plaintiffs' claims; and,  California Government Code shields him from a claim of intentional infliction of emotional distress.

Plaintiff disputes the foregoing, arguing in essence that material facts are, indeed, in dispute and that the true facts establish that Defendant Pinnegar acted unreasonably, without probable cause, and with excessive force in arresting Plaintiff.

The competing claims will be explored in greater detail in the analysis below.

## III.   LAW APPLICABLE TO SUMMARY JUDGMENT GENERALLY

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought." It further provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] A shifting burden of proof governs motions for summary judgment under Rule 56. Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d

---

[1] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

376, 387 (9th Cir. 2010). Under summary judgment practice, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

If the moving party meets its initial responsibility, the opposing party must establish that a genuine dispute as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). To overcome summary judgment, the opposing party must demonstrate the existence of a factual dispute that is both material, i.e., it affects the outcome of the claim under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248). A party opposing summary judgment must support the assertion that a genuine dispute of material fact exists by: "(A) citing to particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[2] Fed. R. Civ. P. 56(c)(1)(A)-(B). However, the opposing party "must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

In resolving a motion for summary judgment, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn from the facts placed before the court must be viewed in a light most favorable to the opposing party. See Matsushita, 475 U.S. at 587; Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). However, to demonstrate a genuine factual dispute, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." Matsushita, 475 U.S. at 587 (citation omitted).

## IV.   RELEVANT FACTS

In his moving papers Defendant Pinnegar identifies fifty-four facts (Defendant's Undisputed Material Facts "DUMF" 1-54) which he contends are without dispute. He asserts that once it is established that these facts are indeed undisputed, they show his

---

[2] "The court need consider only the cited materials, but may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Moreover, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

entitlement to judgment as a matter of law on all causes of action and claims against him.

Instead of reproducing DUMF and identifying those facts disputed and undisputed in accordance with applicable rules, Plaintiff submitted a new list of thirty three facts entitled "Joint Undisputed Material Facts and Supporting Evidence." He has since asserted that confusion over evolving drafts of DUMF caused him mistakenly to respond to an earlier draft. Later, after expiration of the deadline for responding to Defendant's moving papers, Plaintiff submitted an amended response to DUMF in which he lists and, in one fashion or another, addresses each of the fifty-four facts. The Court accepts the late-filed amended response and proceeds on the basis thereof.

So construed, Plaintiff identifies fourteen of the fifty-four of DUMF as being "undisputed." Plaintiff does not explicitly state whether he is disputing the remainder of the fifty-four facts or not, but does cite evidence in support of appended comments labeled "Plaintiff's Opposition and Supporting Evidence." On review of the latter, the Court finds that as to all but those discussed below, Plaintiff's Opposition does not dispute the accuracy of DUMF, but rather undertakes to supplement and clarify them. In summary, the Court finds that Plaintiff, in fact, raises disputes only as to those issues specifically identified below as being in dispute. All facts below not noted as being in dispute, are deemed undisputed:

At about 4:30 p.m., on September 11, 2009, Defendant Merced Police Officer Pinnegar, a fourteen year law enforcement veteran, responded to a reported domestic dispute at Plaintiff's residence at Apartment 109, 2355 "K" Street, Merced California. (DUMF ¶¶ 1-3, ECF No. 34-1.) On arrival at the apartment complex, Pinnegar activated a digital audio recording device he carried (from which a very rough written transcript of the

ensuing dialogue has since been produced).[3] (DUMF ¶ 4.) He was met at the scene by Demetrice Phifer who identified herself as Plaintiff's wife and reported that Plaintiff had abused her in the past and just punched her in the stomach three times. (DUMF ¶¶ 5-6.) She wanted him arrested.

Plaintiff, a double below-the-knee amputee, was at the time sitting in a wheelchair in the open doorway of his apartment with his two year old daughter in his lap. (DUMF ¶¶ 7-9.) He began to approach Pinnegar and Phifer, but was told by Pinnegar to return to his apartment. He did and situated himself just inside his open doorway with the door open.

Pinnegar approached him and in a 'regular' voice, requested, and Plaintiff supplied, identification. (DUMF ¶ 11.) At some point Pinnegar advised Plaintiff that his wife had accused him of domestic violence. (DUMF ¶ 13.) Plaintiff denied the allegation and advised that Phifer was the subject of an outstanding warrant. (DUMF ¶ 11.) It is clear from the audiotape that Pinnegar expressed disbelief as to Phifer's allegations and intended not to arrest Plaintiff on a spousal abuse charge. According to Plaintiff, Pinnegar so informed Plaintiff. (DUMF ¶ 12.)

The two were joined by Merced Police Officer Court and Child Protective Services ("CPS") representative Cathy Clark. (Id.) With all three there, Plaintiff, according to Defendant, "now sat in the doorway to his apartment"; according to Plaintiff, Plaintiff at all times remained inside the threshold of his doorway.  Along these same lines, Defendant Pinnegar maintains that he "never" entered Plaintiff's apartment. (Pinnegar Dep. Tr., p. 145:9-21.) According to Plaintiff, the physical contact which ensued and gave rise to this

---

[3] While the Court shall use portions of the transcript of the audio recording to provide pertinent examples of statements made during the incident, it is noted that the transcript does not accurately reflect all the statements made or accurately identify all the speakers during the incident. A much more accurate transcription will be required if it is to be referenced at trial.

lawsuit occurred after the two officers entered his apartment and while they were inside it. (Williams Dep. Tr., pp. 74-75.)

Clark, the CPS representative, asked Plaintiff for identification information. (DUMF ¶ 16.) Plaintiff objected that he had already provided such information to Pinnegar,  and he objected to further questioning. (DUMF ¶ 17.) According to Defendant, Plaintiff refused to answer the CPS questions and began yelling at the officers. (DUMF ¶ 18.) Plaintiff maintains he did not decline to answer; however, audio transcripts convey a clear unwillingness to respond which most would take as a refusal. Plaintiff responds to the accusation that he began yelling by noting that he was simply confused as to why he was being questioned when he already had been told that he was not going to be arrested. (Williams Dep. Tr., 100-101.) This exchange continued and ultimately resulted in Officer Court advising Plaintiff he was going to be arrested for violating California Penal Code Section 243(e) [spousal abuse], even though Pinnegar had just advised Plaintiff that he was not going to arrest him. (DUMF ¶ 20.) Plaintiff's young daughter was taken from his lap. (Id., ¶ 21.) Plaintiff demanded her back. (Id., ¶ 22.)

Spectators had gathered outside of Plaintiff's apartment. (DUMF ¶ 24.)  (By the time Plaintiff's child was taken their number had increased and they came closer.  According to Plaintiff, the spectators were some 10 to 20 neighbors who originally were about 30 feet away, "only ever coming within 15 feet of the fracas." (Id.)) Plaintiff's brother-in-law arrived and yelled at the police about the way they were treating Plaintiff. (Id. ¶ 25.) Officer Court was sensitive to the crowd and the danger it might pose, but Pinnegar, who had his back to the crowd, was not. (Id. ¶ 27.) Back up was requested to come with lights and sirens. (Id. ¶ 27.)

Thereafter the officers told Plaintiff repeatedly to put his arms behind his back. (DUMF ¶ 29.) Plaintiff did not do so. (Id. ¶ 30.) Defendant claims Plaintiff's hands "remained gripped to his wheelchair" as he stated he was not going to jail. (Id. ¶¶ 31-32.) Plaintiff denies gripping the wheelchair except insofar as he at one point grabbed the chair with one hand for balance to keep from falling face first to the ground. (Id. ¶ 33.) Plaintiff maintains he did not resist the officers.

As the two police officers, one on each of Plaintiff's arms, struggled unsuccessfully to restrain him, Pinnegar advised he would tase Plaintiff. (DUMF ¶ 40.) Tasers are deemed by the Merced Police Department to be a non-deadly control device intended to incapacitate without causing serious injury. The officers chose tasing as an option over pepper spray for fear the latter would inadvertently affect those nearby, including Plaintiff's daughter. (Id. ¶ 40.) According to Pinnegar, he tased Plaintiff in drive-stun mode for from 5 to 60 seconds; downloaded data suggests, and Pinnegar and Court testified, that the taser was used just once on Plaintiff.   (Id. ¶¶ 42, 44-45.) Plaintiff maintains that he was tased more than once. (Williams Dep. Tr., p. 63.) Though not initially recalling how the tasing felt, Plaintiff asserts it was painful and shocking and dazed him and caused him to lose consciousness. (DUMF ¶¶ 46-47.)  He maintains he awoke on the ground with his pants down and his genitals exposed. (Id. ¶ 52.)  He complained of shoulder pain, and Pinnegar called an ambulance. (Id. ¶ 51.) Pinnegar maintains that he and Court placed Plaintiff on the ground and pulled his pants up. There is a dispute as to whether Plaintiff had released his grip on his wheelchair before he was tased or as a result of being tased.

## V.   MATERIAL FACTS IN DISPUTE

From the foregoing, the truly essential facts and disputes can be summarized as

follows:

Police officers investigated what had been reported as a physical assault by Plaintiff on his wife. Defendant became satisfied Plaintiff had not committed spousal abuse and need not be arrested. A CPS representative undertook to question Plaintiff. Plaintiff objected and would not respond.  A group of about 15 to 20 people, standing 15 to 30 feet away, watched the dispute and Plaintiff's child being taken from him. Plaintiff's brother yelled at the police. The officers determined to arrest Plaintiff. There is a dispute as to whether the arrest was undertaken in or just outside of Plaintiff's apartment. Defendant maintains Plaintiff resisted the officers attempt to restrain Plaintiff and grabbed his wheel chair with both hands; Plaintiff denies resisting. A scuffle ensued. Plaintiff was taken to the ground, his arms were forced behind his back and he was tased once according to the officer; more than once according to Plaintiff. Plaintiff was taken into custody.

From that distillation of facts, the crucial issue presented on this motion becomes whether one can say as a matter of law that Defendant had probable cause to arrest Plaintiff, inside or outside of his residence, and whether Defendant used reasonable or excessive force in effecting that arrest.

## VI.   ANALYSIS

### A.   Introduction

The Ninth Circuit has explained that false arrest and excessive force claims are separate and distinct inquiries:

> Although an excessive force claim is subject to a "reasonableness" standard under the Fourth Amendment as is a false arrest claim, the two claims require quite different inquiries. See, e.g., Barlow v. Ground, 943 F.2d 1132, 1135-36 (9th Cir. 1991) (considering unlawful arrest and excessive force claims separately). To evaluate an excessive force claim, we consider

"the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham v. Connor</u>, 490 U.S. 386, 396, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). To evaluate whether the police had probable cause to make an arrest, in contrast, we consider the nature and trustworthiness of the evidence of criminal conduct available to the police. Police have probable cause to arrest where "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." <u>Beck v. Ohio</u>, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964). Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa. <u>See, e.g.</u>, <u>Arpin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 921-22 (9th Cir. 2001) (use of force may be reasonable even in the absence of probable cause).

<u>Beier v. City of Lewiston</u>, 354 F.3d 1058, 1064 (9th Cir. 2004); <u>Mattos v. Agarano</u>, 661 F.3d 433, 443 n.4 (9th Cir. 2011). The existence of probable cause may be considered as a part of the totality of circumstances affecting the excessive force analysis. <u>See</u> <u>Smith v. City of Hemet</u>, 394 F.3d 689 (9th Cir. 2005). Accordingly, the Court shall first address whether the arrest was lawful as the probable cause determination may be relevant to the excessive force analysis.

**B.**   **Plaintiff's Causes of Action Under § 1983**

**1.**   **Unlawful Arrest**

Plaintiff asserts that he was subject to an unlawful arrest because Defendant lacked probable cause to arrest him.  Alternatively, he argues that even if there were probable cause for his arrest, no exigent circumstances existed to obviate the need for a warrant. "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." <u>Lacey v. Maricopa County</u>, 693 F.3d 896, 918 (9th Cir. 2012) (citing <u>Dubner v. City & Cnty. of</u>

S.F., 266 F.3d 959, 964 (9th Cir. 2001)). "Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed." Lassiter v. City of Bremerton, 556 F.3d 1049, 1053 (9th Cir. 2009)."Probable cause exists when there is a fair probability or substantial chance of criminal activity." Lacey, 693 F.3d at 918 (citing United States v. Patayan Soriano, 361 F.3d 494, 505 (9th Cir. 2004) and United States v. Bishop, 264 F.3d 919, 924 (9th Cir. 2001)). "It is well-settled that 'the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search.'" Id.

In general, "officers may not solely rely on the claim of a citizen witness that [she] was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." Peng v. Hu, 335 F.3d 970, 978 (9th Cir. 2003) (quoting Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001)). With that said, "[a] sufficient basis of knowledge is [nonetheless] established if the victim provides 'facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator.'" Id. (quoting Fuller v. M.G. Jewelry, 950 F.2d 1437, 1444 (9th Cir. 1991)). "[T]he presence of a factual dispute regarding a victim's complaint at the scene of an alleged domestic disturbance does not defeat probable cause if: 1) the victim's statements are sufficiently definite to establish that a crime has been committed; and 2) the victim's complaint is corroborated by either the surrounding circumstances or other witnesses." Id. at 979.

Defendant asserts that there was sufficient probable cause to arrest Plaintiff for either domestic violence (Cal. Penal Code § 243(e)(1)) or resisting arrest (Cal. Penal Code

§ 148(a)(1)). Here however, the inquiry clearly hinges on the probable cause to arrest Plaintiff for the underlying crime, in this case domestic violence. "[Plaintiff] cannot be convicted of an offense against an officer engaged in the performance of official duties unless the officer was acting lawfully at the time. 'The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in 'duties,' for purposes of an offense defined in such terms, if the officer's conduct is unlawful.'" Blankenhorn v. City of Orange, 485 F.3d 463, 472 (9th Cir. 2007) (quoting People v. Gonzalez, 51 Cal. 3d 1179, 800 P.2d 1159, 1176, 275 Cal. Rptr. 729 (1990)). "This means, where the offense is committed upon an officer effecting an arrest the arrest must have been lawful." People v. Wilkins, 14 Cal. App. 4th 761, 776 (1993); Walker v. Fresno Police Dep't, 2006 U.S. Dist. LEXIS 26766, 28-29 (E.D. Cal. Apr. 25, 2006).

Plaintiff was arrested for assault on his wife, a violation of California Penal Code § 243(e). In California, where the arrest occurred, the crime is committed "[w]hen a battery is committed against a spouse..." Cal. Penal Code § 234(e)(1). The elements of battery are that the defendant willfully and unlawfully touched the victim in a harmful or offensive manner, and the victim is defendant's spouse, cohabitant or otherwise in a relationship with defendant. See CALCRIM § 841.

California Penal Code § 836 further provides that: "(d) . . . if a suspect commits an assault or battery upon a current or former spouse. . . a peace officer may arrest the suspect without a warrant where both of the following circumstances apply: (1) The peace officer has probable cause to believe that the person to be arrested has committed the assault or battery, whether or not it has in fact been committed. (2) The peace officer makes the arrest as soon as probable cause arises to believe that the person to be

1   arrested has committed the assault or battery, whether or not it has in fact been
2   committed."

3       Furthermore, California Penal Code §13701 requires that "Peace officers shall make
4   reasonable efforts to identify the dominant aggressor in any incident. The dominant
5   aggressor is the person determined to be the most significant, rather than the first
6
7   aggressor." Penal Code § 13701(b) also provides that: "In identifying the dominant
8   aggressor, an officer shall consider the intent of the law to protect victims of domestic
9   violence from continuing abuse, . . . the history of domestic violence between the persons
10  involved, and whether either person acted in self-defense."

11      On his arrival at the scene of reported domestic violence, Defendant Pinnegar was
12
13  met by a woman who identified herself as the wife of Plaintiff and asserted that she had
14  been punched in the stomach three times by Plaintiff. Conducing his own investigation,
15  Pinnegar statements reflect that he had concluded that the complaining witness was not
16  trustworthy. He was critical of her claims that she had been injured. He had her arrested
17  on an outstanding warrant.  He determined and advised Plaintiff and others that he was
18  not intending to arrest Plaintiff.  Thus, the evidence before the Court reflects  that Pinnegar
19
20  had determined that there was not good cause to arrest Plaintiff. At the very least, it must
21  be said that there is a dispute over whether there was sufficient factual support to establish
22  probable cause to arrest Plaintiff for domestic violence.

23      Defendant asserts Phifer's statements alone were sufficient to establish probable
24  cause to arrest Plaintiff. However, to the extent those statements may have been sufficient
25  at one time, Pinnegars comments during the incident at least suggest that he had
26
27  concluded, based on the totality of the circumstances before him, that they were not and

-14-

thus that there was not probable cause to arrest.

While apparently talking to another officer, Pinnegar stated:

> Pinnegar: She's got to go to the Pokey. And ah, ... confined to a wheelchair...I...DV even though she said what she said she's got no injuries, he's confined to a wheelchair. He can't even stand up to friggin' punch her... he's confined to a wheelchair, he's pissed all over himself, he's, he has no legs below the knee... he, no way plus she's got 243(e)(1) warrants. No injuries...

> Unknown Speaker: Take her to jail on the warrants but you better fucking document...

> Pinnegar: I, I will but I'm saying basically it's crap.

(Pinnegar Decl., Ex. B at 9.)

After talking to both Phifer and Plaintiff, Pinnegar returns to Plaintiff's apartment to explain that he would not be arrested for domestic violence:

> Pinnegar: I'm not taking you to jail. No, no, no, no, sir...listen to what I am saying. When I'm talking and your talking you can't understand a word I'm saying.

> Williams: Okay.

> Pinnegar: I don't see any injuries on her but I've still got to document the fact that she's making an allegation. Do you understand that? Whether it happened or not I still have to make a report, do you understand? Okay, that's what I am going to do, yes sir.

> Williams: ...saying that but... nothing like...

> Pinnegar: No, I'm not sending it to the DA for a complaint, do you understand that?

(Pinnegar Decl., Ex. B at 11.)

After Plaintiff was arrested, Pinnegar attempted to discuss what had occurred:

> Pinnegar: She made allegations that he 243'd her, okay. I didn't really believe the allegations, she didn't have any injuries. I was gonna do a... close it out with a report, later ... warrant. Somebody called CPS, CPS showed up, CPS wanted to talk with him about, you know that there was alleged drug

use in the house in front of the child, alleged domestic violence going in the house and he, he, that set him off, he didn't want, he...

(Pinnegar Decl., Ex. B at 15.) Based on his statements during the incident, there is significant evidence to infer that Pinnegar believed there was not probable cause to arrest Plaintiff.

In his declaration in opposition to the motion for summary judgment, Pinnegar stated that he lied to Plaintiff when  he said he was not going to arrest him, and that he in fact had made the decision to arrest Plaintiff as soon as he had talked to Phifer. (Pinnegar Decl. at 131-33.) The evidence shows that a factual dispute exists regard whether Pinnegar found Phifer credible.. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Based on the record, a genuine issue of material fact exists regarding whether Pinnegar found Phifer's account credible.

Pinnegar's subjective determination of probable cause is not dispositive of the inquiry. See  Lassiter, 556 F.3d at 1053 (probable cause is an objective standard - based on if "a reasonably prudent person" would believe that a crime has been committed."). Regardless, his determination is highly relevant. According to the record, he was the only peace officer to talk to the alleged victim, and therefore the only party in a position to assess her credibility. His failure to find her account credible creates a strong inference that it was not and creates genuine issues of material fact crucial to the determination of the existence or lack of probable cause.

Defendant claims that Phifer's account established probable cause because it was sufficiently definite and corroborated by the audio recording of her comments. See Peng

v. Hu, 335 F.3d 970, 979. Defendant's argument that Phifer's statements were corroborated is without merit. The victim's complaint must be "corroborated by either the surrounding circumstances or other witnesses." Id. Phifer complained about injuries which, if established, could corroborate her testimony. However, Pinnegar, who was in a position to observe Phifer, did not believe that she had been injured. (See Pinnegar Decl., Ex. B at 9.  ("[E]ven though she said what she said she's got no injuries.") Based on the factual dispute regarding whether there was corroboration of her complaint, a genuine issue of fact exists regarding whether there was probable cause to arrest Plaintiff for domestic violence.

If Defendant lacked probable cause to arrest Plaintiff for domestic violence, then he also necessarily lacked probable cause to arrest Plaintiff for resisting arrest. See Blankenhorn, 485 F.3d at 472. Additionally, if Defendant's lacked probable cause, then it is immaterial whether or not there were exigent circumstances to arrest Plaintiff in his dwelling;[4] probable cause must first be established.

## 2. Excessive Force

Defendant also moves for summary judgment as to Plaintiff's claim that Pinnegar violated Plaintiff's Fourth Amendment rights to be free of unreasonable seizure by using plain compliance techniques and deploying a taser on Plaintiff in "drive stun mode."

"Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures." Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010) (citing, among other authorities, Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). All claims that law enforcement officers used excessive force in the course of an arrest, investigatory stop, or other seizure are analyzed

---

[4] The parties dispute whether Plaintiff was inside or outside his apartment at the time of the arrest.

exclusively under the Fourth Amendment's "reasonableness" standard. See, e.g., Smith v. City of Hemet, 394 F. 3d 689, 700 (9th Cir. 2005) (en banc). "Determining the reasonableness of an officer's actions is a highly fact-intensive task for which there are no per se rules." Torres v. City of Madera, 648 F.3d 1119, 1124 (9th Cir. 2011); accord Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) ("More recently, the Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of 'reasonableness.'" (modification in original) (citing Scott v. Harris, 550 U.S. at 383). Since "[n]ot every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, . . . violates the Fourth Amendment," Graham, 490 U.S. at 396, "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes excessive force." Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007.) "Force is excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002). When the circumstances show that there is no need for force, any force used is constitutionally unreasonable. See Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir. 2001); see also Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005).

The reasonableness "analysis requires balancing the 'nature and quality of the intrusion' on a person's liberty with the 'countervailing governmental interests at stake' to determine whether the use of force was objectively reasonable under the circumstances." Smith, 394 F.3d at 701 (citing Graham, 490 U.S. at 396). The Court first considers the "nature and quality of the alleged intrusion." Mattos, 661 F.3d at 441. The Court then considers the governmental interests at stake by examining three non-exclusive factors: "(1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat

to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id. The second of these factors—whether the suspect posed an immediate threat to the safety of the officers or others—is the "most important" factor. Id.

a.    Nature and Quality of Alleged Intrusion

Defendant in undertaking to arrest Plaintiff, grabbed his arms and attempted to use pain compliance techniques to place him in handcuffs. After not being able to get Plaintiff's hands behind his back, Defendant tasered him in "drive-stun mode" to effectuate the process. During the course of the arrest, Plaintiff alleges he was taken to the ground and that his pants fell down exposing his genitals. Plaintiff asserts that he was not warned before he was tased, but  the audio recording of the incident clearly reflects Defendant's explicit warning.

It is of note that at the time of the incident, Plaintiff's wife had reported that he had struck her several times in the stomach. On the other hand it, is also relevant that, at the time of the incident, Plaintiff, a double amputee, was sitting in a wheelchair with his young daughter on his lap. Defendant does not assert that Plaintiff took any violent action, such as attempting to strike the peace officers or that he showed an intent to flee. Instead, Defendant asserts that Plaintiff raised his voice and refused to let go of his wheelchair to allow the police to handcuff him. Plaintiff challenges those contentions and asserts that he was not told to put his arms behind his back, that he did not resist, and at most, grabbed his wheelchair with one hand to regain his balance.

The Court will apply the Graham factors to determine whether the amount of force used by Defendant was excessive. The quantum of force at issue is the application of pain

-19-

compliance holds and a taser device in the "drive-stun" or direct contact mode.

Pain compliance holds are broadly characterized as less significant than most claims of force. Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994) ("The police did not threaten or use deadly force and did not deliver physical blows or cuts. Rather, the force consisted only of physical pressure administered on the demonstrators' limbs in increasing degrees, resulting in pain."). Here, the physical force applied by Defendant and other officers appears to have been a relatively low level force, while Plaintiff asserts that it was painful, it was not effective in getting Plaintiff to comply and place his hands behind his back for handcuffing.

In terms of the nature and quality of the alleged intrusion regarding taser use, the Ninth Circuit Court of Appeals has separately characterized the use of a taser in the "drive-stun mode" and the "dart mode." In terms of use of a taser in the "dart mode," that Court has held that such usage constitutes "an intermediate, significant level of force that must be justified by the governmental interest involved." Bryan, 630 F.3d at 826. The Court of Appeals has not specifically categorized the nature and quality of the intrusion at issue when a taser is used in the "drive-stun" mode, which is apparently a lower setting or lesser application of the taser than the "dart mode."[5] See Mattos, 661 F.3d at 443. In viewing the facts in the light most favorable to Plaintiff, the Court shall assume that the taser use in drive stun mode constituted a somewhat less than intermediate level of force.

---

[5] In Mattos, the Court of Appeals generally described the use of a Taser in "drive stun mode" as follows: "When a taser is used in drivestun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode." Mattos, 661 F.3d at 443. But the Court of Appeals ultimately stated that the record in Mattos was insufficient to "to determine what level of force is used when a taser is deployed in drive-stun mode." Id.

-20-

b.    Governmental Interests

Considering the first governmental interest factor, the severity of the crime at issue, courts have been mindful of the danger posed to officer safety by the overall situation presented in a response to a domestic dispute call. Mattos, 661 F.3d at 450. In general, "while the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." Bryan, 630 F.3d at 828-829, 2010 U.S. App. LEXIS 25895 (9th Cir. 2010). However, while domestic violence is a misdemeanor, the Ninth Circuit explained that it is treated differently:

> We have observed that "[t]he volatility of situations involving domestic violence" makes them particularly dangerous. United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005). "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." Id. (internal quotation marks and citation omitted). We have also "recognized that the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy." United States v. Black, 482 F.3d 1035, 1040 (9th Cir. 2007) (internal quotation marks omitted).

Mattos, 661 F.3d at 450. Here, Plaintiff had been accused of punching his wife several times. Accordingly, the officers had been told  that Plaintiff may have acted in a violent manner shortly before the incident was reported. Striking someone without a weapon is generally not considered to be lethal force, however it is possible that physical injuries can easily occur. Based on the reports of the victim, the severity of crime at issue was moderate.

The next, and most important, Graham factor is whether "the *suspect* posed an immediate threat to the safety of the officers or others." Mattos, 661 F.3d at 449 (emphasis in original). Defendant came to the residence in response to a 911 call made by Plaintiff's

wife regarding a domestic dispute. Once Defendant arrived and spoke to Phifer, Defendant sat in his wheelchair with his small child on his lap until Defendant came over to hear his side of the story. Phifer stated that Plaintiff struck her with his fists, and Defendant provides no objective reasons to believe that he was armed. Plaintiff also discussed the matter with Defendant in a relatively calm voice for a significant period of time. Plaintiff posed little threat to the officers.

Instead of focusing on the threat posed by Plaintiff, Defendant suggests that the officers were threatened by a crowd that was forming around the scene. As the Ninth Circuit emphasized in Mattos, the inquiry is as to threat posed by the *suspect*. 661 F.3d at 449. In Mattos, Jayzel Mattos, who was involved in a domestic dispute with her husband, was caught in a confrontation between her husband and the police and was tasered. While Jayzel's husband Troy, who was reported to be large, drunk and upset, was right behind her at the time she was tasered, the Ninth Circuit only focused on the treat to the officers from Jayzel, not Troy. Id. The court found her to be no threat to the officers. Id. In other decisions, the Ninth Circuit has found actions of a group to be relevant when a member of the group was the alleged victim of excessive force. For example, the Court took into account the role played by the crowd when officers attempted to diffuse a confrontation between agitated rival professional football team fans. See Eberle v. Anaheim, 901 F.2d 814, 820 (9th Cir. 1990).[6]

---

[6] "The events giving rise to this case began in the stadium stands during a football game between historical rivals. Emotions run high during these events. Passion can supplant reason. Behavior can become reactive rather than reflective. Aggressive conduct is not uncommon. The potential for violence is omnipresent. Indeed, at the time Officer McMillian applied the finger-hold to Kiser, Kiser's friends were scuffling with other officers in the concourse and actively resisting arrest. A crowd of sixty-to-seventy spectators had gathered to yell and cheer at the spectacle. It is hard to imagine a more explosive and potentially dangerous situation than that which confronted the officers." Id.

1    That was a vastly different scenario than present here. Plaintiff does not deny that

2    a crowd had gathered and was critical of the officer's actions, but unlike in Eberle, the

3    spectators had not taken violent action nor were there signs the situation could degenerate

4    to widespread melee between spectators. "As the Supreme Court has noted, '[t]he freedom

5    of individuals verbally to oppose or challenge police action without thereby risking arrest

6    is one of the principal characteristics by which we distinguish a free nation from a police

7    state." United States v. Poocha, 259 F.3d 1077, 1082 (9th Cir. 2001) (citing Houston v. Hill,

8    482 U.S. 451, 462-63, (1987)). In this case, the crowd was expressing displeasure with the

9    officer's treatment of Plaintiff. While Defendant notes that Plaintiff's brother-in-law spoke

10   in an aggressive manner towards him, there is no other description of the members of the

11   crowd acting in a threatening matter. (See Pinnegar Decl. at 179-80.) As Plaintiff was not

12   acting in a threatening manner and the onlookers were not a physical threat, this fact

13   weighs in favor of Plaintiff.

14

15   The third enumerated governmental interest factor is whether Plaintiff was actively

16   resisting arrest or attempting to evade arrest by flight. According to Plaintiff's rendition of

17   the facts, the most that can be said is that he did not comply with the officers's instructions

18   and therefore minimally resisted arrest.[7] Regardless of his subjective intent and regardless

19   of whether he intended to disregard the officer's instructions, Plaintiff failed to comply with

20   the instructions and placed one hand on his wheelchair. "[T]he crux of this Graham factor

23

---

24      [7] Plaintiff contends that officer did not instruct him to give them his hands before attempting to

25   restrain him, that he did not grip his wheelchair with his hands in resistance (but for grabbing the
     wheelchair for balance during the incident), and that he was confused by the officer's actions. (See DUMF

26   ¶ 29-35.) While accepting the facts in a light most favorable to Plaintiff, the audio recording of the incident
     clearly indicates that the officers instructed Plaintiff to put his arms behind his back. While Plaintiff may not

27   have heard the instructions, his assertion that officers did not provide instruction is clearly contradicted by
     the record and shall not be considered. See Scott v. Harris, 550 U.S. 372, 380 (2007).

-23-

is compliance with the officers' requests, or refusal to comply." Mattos, 661 F.3d at 450. While Plaintiff asserts that the officers did not warn him before deploying the taser, he states that he "repeatedly told the officers not to tase him because he was taking medication for his heart." (DMUF ¶ 40.) Plaintiff was therefore aware that the officers were threatening to use a taser. In summary, despite instructions from the officers, Plaintiff did not comply. While Plaintiff's attempts to resist arrest were minimal and there is no evidence of an attempt to evade arrest by flight, Plaintiff, failed to comply, and this factor weighs in Defendant's favor.

Finally, it is important to consider the additional "'specific factors'" relevant to the totality of these circumstances. Mattos, 661 F.3d at 450; Bryan, 630 F.3d at 826. Here, the threat of safety to others is a paramount concern of the officers. However, at the time the arrest was made, Plaintiff's wife had been arrested on an outstanding warrant and protective services had removed his child from his lap. It was therefore highly improbable that Plaintiff could commit acts of domestic violence upon the other members of his family. Further, the facts do not indicate that Plaintiff was acting in a threatening or aggressive manner towards the officers or others prior to the confrontation. Plaintiff's impaired physical condition cannot be ignored. Plaintiff was a double amputee and confined to a wheelchair. The officer's were clearly aware that Plaintiff's ability to ambulate and physically resist was impeded. While force may still be required to effectuate an arrest of someone with physical disabilities, it is imperative that peace officers take into account a suspect's physical condition in crafting the appropriate response.

Considering the totality of these circumstances, and resolving all material factual disputes in Plaintiff's favor, the Court concludes that a reasonable fact finder could

conclude that Defendant's use of force, as alleged, was constitutionally excessive in violation of the Fourth Amendment.

### 3.    Qualified Immunity

#### a.    Relevant Law

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" in their individual capacities. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made," and that it is "often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces." Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002) (citation omitted). This is why the rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id. at 1043 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). A public official is entitled to qualified immunity if the law governing the official's conduct was not clearly established, or if under clearly established law he could have reasonably believed that his conduct was lawful. Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001); Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991). The defendant bears the burden of establishing qualified immunity. Crawford-El v. Britton, 523 U.S. 574, 586-87 (1998).

A court employs a tiered analysis for determining qualified immunity. See Saucier v. Katz, 533 U.S. at 200-02; Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th Cir. 2006); Brittain v. Hansen, 451 F.3d 982, 987 (9th Cir. 2006). Under the first step, the court determines whether, "taken in the light most favorable to the party asserting the injury, do

the facts show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at

201; Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Skoog, 469 F.3d at 1229. If the

answer is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes,"

the court continues the analysis. See Saucier, 533 U.S. at 201; Blankenhorn v. City of

Orange, 485 F.3d 463, 471 (9th Cir. 2007); Johnson v. County of L.A., 340 F.3d 787,

793-94 (9th Cir. 2003).

Under the second step, the court determines "whether the right was clearly

established," and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504

F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988. The

critical question is whether "the contours of the right were sufficiently clear that a

reasonable official would understand that what he is doing violates the right." Saucier, 533

U.S. at 202; Phillips, 477 F.3d at 1079. Whether a right is clearly established must be

"undertaken in light of the specific context of the case, not as a broad general proposition."

Saucier, 533 U.S. at 201; Skoog, 469 F.3d at 1229-30. In making this determination, the

court considers the state of the law at the time of the alleged violation, but it is unnecessary

for the precise conduct in question to have been previously held unlawful. See Inouye, 504

F.3d at 712; Devereaux v. Perez, 218 F.3d 1045, 1052 (9th Cir. 2000). Further, the court

considers the "information possessed" by the officer at the time of his conduct. See Hunter

v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton, 483 U.S. 635, 641 (1987);

Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th Cir. 2007). If the officer

could have reasonably, but mistakenly, believed that his conduct did not violate a clearly

established constitutional right, then the officer will receive qualified immunity. See Saucier,

533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v. City

of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001). As a wholly objective inquiry, see Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual officer are . . .irrelevant." Inouye, 504 F.3d at 712; see Anderson, 483 U.S. at 641. Thus, qualified immunity applies "if 'a reasonable officer could have believed [the action] to be lawful, in light of clearly established law and the information the . . . officer[] possessed.'" Lawrence v. United States, 340 F.3d 952, 956-957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.

Lower courts need not strictly follow the tiered sequence in analyzing qualified immunity, but instead may dispose of the issue at step two without addressing step one. Pearson v. Callahan, 555 U.S. 223 (2009); Moss v. United States Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009).

b. Analysis

(1) Unlawful Arrest

Having found that Plaintiff's version of the facts prohibits summary judgment on whether the Fourth Amendment was violated with respect to the incident at issue, the Court proceeds to determine whether Defendant is entitled to qualified immunity.

Plaintiff alleges that Pinnegar violated his Fourth Amendment right to be free of an unlawful seizure because Pinnegar arrested him without probable cause. Pinnegar arrested Plaintiff for domestic violence under California Penal Code § 243(e)(1).

"[E]ven absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information the searching officers possessed." Blankenhorn v. City of Orange, 485 F.3d 463, 476 (9th Cir. 2007); Peng, 335 F.3d at 980. "Our inquiry is an objective one, based on what a reasonable officer would believe if faced with the facts and

circumstances actually known to the officer in question." <u>Franklin v. Fox</u>, 312 F.3d 423, 437 (9th Cir. 2002). "Thus, [Defendant is] entitled to qualified immunity unless [Plaintiff] can identify evidence from which a factfinder could conclude that the officers did not reasonably believe that they had probable cause to arrest [Plaintiff]." <u>Id.</u> at 439. As described above, Plaintiff has provided such evidence. Given Defendant Pinnegar's statements at the scene, there are genuine issues of fact whether Phifer was credible, and there was little, if any, corroborating evidence to support her claims of domestic violence. While Pinnegar asserts in his declaration that Phifer's statements alone established probable cause, his recorded statements indicate that he questioned the truthfulness of her statements including whether she was injured. As a fact finder could conclude that the officers did not reasonably believe that probable cause existed, Defendant is not entitled to qualified immunity on this ground.

(2)     Excessive Force

Defendant asserts that he is entitled to qualified immunity with regard to taser use because the law restricting such use was not clearly established as of September 11, 2009. After reviewing the case law, the Court agrees that the law was not clearly established as of September 11, 2009  that a reasonable officer in Defendant Pinnegar's position would have known that using hands-on force and a taser in drive stun mode on a non-compliant arrestee was unconstitutional.

As discussed above, use of a taser in drive stun mode is a less than an intermediate level of force. Tasers are designed to cause temporary immobilization, most often in order to secure handcuffs. <u>See</u> <u>Brooks</u>, 599 F.3d at 1030-31. The Ninth Circuit and this Court recently, after the events in this case, held that the law regarding tasers was not sufficiently and clearly enough established to warrant denying officers qualified immunity under the

facts of those respective cases. See Mattos v. Agarano, 661 F.3d 433, 452 (9th Cir. 2011) (law not clearly established as of November 2004 or August 2006); Wade v. Fresno Police Dep't, 2012 U.S. Dist. LEXIS 8712, 51, 2012 WL 253252 (E.D. Cal. Jan. 24, 2012) (law not clearly established as of April 25, 2008.).

Here, Plaintiff was at least minimally resistive to being placed under arrest. A reasonable officer in Defendant Pinnegar's position could have believed that Plaintiff's conduct presented some threat, however minimal, to the safety of Defendant or other officers. Given the state of the case law on September 11, 2009, the Court concludes that it was not clearly established that a reasonable officer in Defendant Pinnegar's position would know that the use of hands-on force and a taser was unconstitutional. But see Abbott v. Sangamon County, 2013 U.S. App. LEXIS 1963, 70-71 (7th Cir. Ill. Jan. 29, 2013).[8] The Court will grant Defendant Pinnegar qualified immunity for his use of force during the incident. Accordingly, Pinnegar's motion for summary judgment shall be granted with regard to Plaintiff's claims of excessive force.

## C.   Plaintiff's State Law Causes of Action

### 4.   California Civil Code § 52.1

California Civil Code § 52.1 permits an individual to bring civil action for interference with his rights under the United States or California Constitutions by threats, intimidation, or coercion. Venegas v. Cnty. of Los Angeles, 153 Cal. App. 4th 1230, 1239, 63 Cal. Rptr. 3d 741 (2007). "Section 52.1 does not provide any substantive protections; instead, it

---

[8] "The Ninth Circuit has held that the absence of any case law involving tasers means that officers are entitled to qualified immunity. But, as the Sixth Circuit has explained, just as defining a right too broadly may defeat the purpose of qualified immunity, defining a right too narrowly may defeat the purpose of § 1983. Moreover, we have explained that every time the police employ a new weapon, officers do not get a free pass to use it in any manner until a case from the Supreme Court or from this circuit involving that particular weapon is decided." Id. (citations and internal formatting omitted).

enables individuals to sue for damages as a result of constitutional violations." Reynolds v. Cnty. of San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996), overruled on other grounds, Acri v. Varian Assocs., Inc., 114 F.3d 999, 999-1000 (1997). Plaintiff's claim under California Civil Code § 52.1 stems from his unlawful arrest and excessive force claim under the Federal Constitution. Thus, it is also evaluated under the reasonableness standard of the Fourth Amendment. See Jones v. Kmart Corp., 17 Cal. 4th 329, 331 (1998) (the elements of claims under Cal. Civ. Code § 52.1 are essentially identical to claims under § 1983). Plaintiff and Defendant agree that the "claim turns on [Plaintiff's] Forth Amendment claim." (Reply at 13, ECF No 36.)

The Ninth Circuit and the California Court of Appeal, however, have expressly held that qualified immunity under federal law does not apply to claims under California Government Code § 52.1. Cousins v. Lockyer, 568 F.3d 1063, 1072 (9th Cir. 2009) (holding that "California law is clear" that qualified immunity is a federal doctrine that does not apply to tort or civil rights claims under state law); Venegas, 153 Cal. App. 4th at 1246 ("[Q]ualified immunity of the kind applied to actions brought under 42 [U.S.C. § 1983] does not apply to actions brought under section 52.1.").

Thus, Defendant Pinnegar is not entitled to qualified immunity from Plaintiff's claim under § 52.1. Defendant's motion for summary judgment on this claim is DENIED.

### 5.   Intentional Infliction of Emotional Distress

Plaintiff's claim for Intentional Infliction of Emotional Distress ("IIED") asserts that he suffered emotional distress due to the outrageous conduct exhibited by Defendants. To plead a cognizable claim for IIED, a Plaintiff must allege (1) outrageous conduct by the defendant; (2) an intention by the defendant to cause, or reckless disregard of the

probability of causing, emotional distress; (3) severe emotional distress; and (4) an actual and proximate causal link between the tortious conduct and the emotional distress. Nally v. Grace Cnty. Church of the Valley, 47 Cal. 3d 278, 300 (1988).

Defendant argues that he cannot be liable for this state law tort under the immunity provisions of California Government Code § 821.6. "[P]ublic employees, acting within the scope of their employment, and the public entity, are immune from tort liability for any acts done by the employees in preparation for formal judicial or administrative proceedings, including investigation of alleged wrongdoing, and for any acts done to institute and prosecute such formal proceedings." Hansen v. Cal. Dept. of Corrs. & Rehab., 171 Cal. App. 4th 1537, 1547 (2008).[9] Plaintiff asserts that section 821.6 is limited to actions taken during an investigation, not an arrest. See Blankenhorn v. City of Orange, 485 F.3d 463, 487-488 (9th Cir. 2007). The California Supreme Court in Sullivan v. County of Los Angeles held that "the history of section 821.6 demonstrates that the Legislature intended the section to protect public employees from liability only for malicious prosecution . . . ." 12 Cal.3d 710, 719 (1984). This holding, however, has been distinguished by numerous California Court of Appeal decisions which find that Section 821.6 applies to claims other than malicious prosecution, including IIED claims. See, e.g., Randle v. City and Cnty. of San Francisco, 186 Cal. App. 3d 449, 456 (1986); Javor v. Taggart, 98 Cal.App.4th 795, 808-09 (2002).

The Court agrees with the California Supreme Court's decision in Sullivan and finds that Section 821.6 only applies to claims for malicious prosecution. A recent law review

---

[9]  Section 821.6 "applies to police officers as well as public prosecutors since both are public employees within the meaning of the Government Code." Randle v. City and Cnty. of San Francisco, 186 Cal. App. 3d 449, 455 (1986).

article has examined the inconsistent positions taken by California courts on this issue and explained why the better approach — which this Court adopts — is to interpret Section 821.6 as only immunizing public employees' conduct with respect to claims stemming from the institution or prosecution of a judicial proceeding. See Frank J. Menetrez, Lawless Law Enforcement: The Judicial Invention of Absolute Immunity for Police and Prosecutors in California, 49 Santa Clara L. Rev. 393 (2009) (summarizing the case law with respect to Section 821.6 and explaining how the immunity should be applied in the future); see also Dinius v. Perdock, 2012 U.S. Dist. LEXIS 72722, 28, 2012 WL 1925666 (N.D. Cal. May 24, 2012). The Court therefore holds that section 821.6 does not automatically immunize Defendant's investigatory conduct against Plaintiff's IIED claim.

Defendant also asserts that insufficient evidence supports Plaintiff's IIED claim. The Court is not concerned at this juncture with weighing the relative sufficiency of the evidence. In resolving all material factual disputes in Plaintiff's favor and reviewing the evidence in the light most favorable to him, genuine issues of fact exist regarding whether there was probable cause to arrest Plaintiff and whether Defendant engaged in intentionally outrageous conduct. Defendant's motion for summary judgment is DENIED as to this claim.

### 6.    Assault and Battery

Defendant asserts that Plaintiff's assault and battery claims fail on the same basis that Defendant did not use excessive force. Since there are genuine issues of material fact regarding whether excessive force was used, genuine issues of fact remain regarding Plaintiff's assault and battery claims. Defendant's motion for summary judgment is DENIED as to this claim.

### 7.    Punitive Damages Under State Law

Punitive damages are authorized in a 42 U.S.C. §1983 claim if a defendant's conduct was malicious, oppressive, or in reckless disregard for a plaintiff's rights. See Dang v. Cross, 422 F.3d 800, 806-09 (9th Cir. 2005); Ninth Circuit Model Instr. No. 5.5. Under California state law, punitive damages are authorized if a plaintiff can show by clear and convincing evidence that a defendant acted with malice, oppression, or fraud. See Cal. Civ. Code § 3294(a). Under California law, "malice" means inter alia "conduct which is intended by the Defendant to cause injury to the plaintiff . . . ." Cal. Civ. Code § 3294(c)(1); Lackner v. North, 135 Cal.App.4th 1188, 1210, 1212 (2006). The higher "clear and convincing evidence" standard applies at the summary judgment stage. Brandon v. Rite Aid Corp., 408 F.Supp.2d 964, 981 (2006).

Defendant argues that there is no evidence of malice, fraud, oppression. (MSJ at 20.) However, as discussed above, there is a dispute whether there was probable cause to arrest Plaintiff and whether excessive force was used to effectuate the arrest. Because there is a genuine dispute whether Plaintiff was unlawfully arrested or of excessive force was used, the motion for summary judgment on Defendant's request for punitive damages is DENIED.

## VII.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is:

(1) DENIED as to Plaintiff's section 1983 claim for unlawful arrest against Defendant Pinnegar.

(2) GRANTED as to Plaintiff's section 1983 claim for excessive use of force against Defendant Pinnegar.

-33-

(3) DENIED as to Plaintiff's claim of under California Civil Code § 52.1.

(4) DENIED as to Plaintiff's state law claims for intentional infliction of emotional distress, assault, and battery.

(5) DENIED as to Plaintiff's claim for punitive damages under state law.

IT IS SO ORDERED.

Dated:   February 7, 2013          /s/ *Michael J. Seng*
                                        UNITED STATES MAGISTRATE JUDGE

-34-